## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

NICHOLAS DEBELLA,

     Petitioner,

v.                                                  Case No. 8:20-cv-2206-WFJ-MRM

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## <u>ORDER</u>

Nicholas Debella, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 7). Mr. Debella filed a reply. (Doc. 8). At the Court's direction, the parties also submitted supplemental briefs. (Docs. 13, 14). After careful review, the petition is **DENIED**.

## I.    Background

This case arises from Mr. Debella's participation in an armed robbery at an apartment complex in St. Petersburg, Florida. On the evening of July 10, 2014, Mr. Debella was "hanging out" at his parents' house with co-defendants Gedeon Tirado and Matthew Cappellino. (Doc. 7-2, Ex. 13, at 800). The following morning, Mr. Tirado texted his friend Kevin Topping to let him know that he was coming by Mr. Topping's apartment to retrieve "some things that . . . he had forgotten." (*Id.*, Ex. 11, at 412). During the conversation, Mr. Topping agreed to "buy some Xanax" from Mr. Tirado. (*Id.*)

1

Shortly before 9:00 a.m., Mr. Tirado, Mr. Debella, and Mr. Cappellino arrived at the apartment complex. (*Id.* at 394; *id.*, Ex. 14, at 803-04). Mr. Tirado knocked on the door. (*Id.*, Ex. 11, at 412). Mr. Topping saw Mr. Tirado through the peephole, but he did not see anybody else. (*Id.* at 413). Indeed, Mr. Topping was not "expecting anyone other than" Mr. Tirado. (*Id.*) When Mr. Topping opened the door, Mr. Tirado entered with Mr. Debella and Mr. Cappellino behind him. (*Id.*) Mr. Debella and Mr. Cappellino were wearing gloves. (*Id.*) Before Mr. Topping had "a chance to say anything," Mr. Debella punched him in the mouth. (*Id.* at 414). Meanwhile, Mr. Tirado stood guard at the door with a "steel revolver" in his hand. (*Id.* at 415).

Mr. Topping was not alone in the apartment. His girlfriend Ashleigh Hudson was in the bedroom, and his friend Daniel Saad was lying on a couch in the living room. (*Id.* at 411). After he was punched, Mr. Topping "yelled for" Ms. Hudson, hoping that she would retrieve a handgun they kept in the bedroom. (*Id.* at 415-16). Mr. Tirado said Ms. Hudson "wasn't supposed to be home," and Mr. Cappellino entered the bedroom to subdue her. (*Id.*, Ex. 12, at 531). Holding a "dark gray gun," Mr. Cappellino kicked Ms. Hudson and told her "to let go of [her] gun or he'd kill" her. (*Id.*) Soon after, Mr. Debella led Mr. Topping into the bedroom. (*Id.* at 418). Back in the living room, Mr. Saad "leaned up over the coffee table," prompting Mr. Tirado to say, "Sit down and shut the f*ck up and nothing will happen." (*Id.* at 496-97).

Mr. Debella and Mr. Cappellino tried to find Mr. Topping's wallet in the bedroom, but they were unsuccessful. (*Id.* at 418). Their attention soon turned to a safe "next to [the] bed." (*Id.* at 419). They told Mr. Topping to open it; he could not do so because he "didn't

2

remember the combination." (*Id.*) Mr. Tirado then "bolted out the front door," whereupon Ms. Hudson elbowed Mr. Cappellino "in the face" and ran out of the apartment. (*Id.*, Ex. 12, at 537). Mr. Debella and Mr. Cappellino left the apartment as well, taking with them a PlayStation 3, a tablet computer, two laptops, and Mr. Topping's gun. (*Id.*, Ex. 11, at 422; *id.*, Ex. 12, at 501, 538).

Immediately after the robbery, Ms. Hudson called 911 and reported that "her boyfriend" had "opened the door and they just robbed us at gunpoint." (*Id.*, Ex. 12, at 546). She identified the perpetrators by name—Mr. Debella, Mr. Cappellino, and Mr. Tirado. (*Id.*) Although Mr. Topping had never met Mr. Debella before the robbery, Ms. Hudson knew him as a friend of Mr. Tirado. (*Id.*, Ex. 11, at 410; *id.*, Ex. 12, at 526).

Law enforcement set up surveillance outside Mr. Debella's last known address. (*Id.*, Ex. 13, at 715). Approximately thirty minutes after the 911 call, a "gold Toyota" parked outside the residence, and four men "wearing all black" exited the vehicle. (*Id.* at 663). Two were "carrying items"; all were "running quickly toward the front door of [the] house." (*Id.*) About an hour later, two of the men exited the house, got back in the car, and drove off. (*Id.* at 663-64). Law enforcement then knocked on the door, and Mr. Debella answered. (*Id.* at 677). He was arrested along with Mr. Tirado, who was also in the residence. (*Id.* at 677-78, 685). Once he was in custody, Mr. Debella spontaneously said, "They had the guns." (*Id.* at 696). Mr. Cappellino was arrested three days later. (*Id.* at 720-21).

Mr. Debella was charged with armed home invasion robbery. (*Id.*, Exs. 2, 7). The case went to trial. Mr. Debella did not testify in his defense, but he called his co-defendant

3

Mr. Cappellino as a witness. (*Id.*, Ex. 14, at 797). Mr. Cappellino, a fifteen-time convicted felon, testified that he, Mr. Debella, and Mr. Tirado went to Mr. Topping's apartment to "get some pills." (*Id.* at 803, 812). According to Mr. Cappellino, the three were let inside, and Mr. Tirado and Mr. Topping began to talk in the dining room. (*Id.* at 805-08). Mr. Cappellino allegedly became "frustrated" with Mr. Topping, and the two got in a "scuffle." (*Id.* at 809). Mr. Cappellino testified that he punched Mr. Topping "[j]ust once." (*Id.*) He then heard Mr. Topping "yell something" to Ms. Hudson "about a gun," which prompted Mr. Cappellino to "[run] over and [] grab[] the gun" because he "didn't want to get shot in [the] back running out the door." (*Id.* at 810, 827). At this point, according to Mr. Cappellino, he left the apartment with Mr. Debella and Mr. Tirado. (*Id.* at 810). Mr. Cappellino claimed that the gun was the only item taken from the apartment, and that Mr. Debella was "[j]ust standing in the living room" while events unfolded. (*Id.*)

Mr. Cappellino admitted that, several months before trial, he pled guilty to "home invasion robbery" for his role in the July 11, 2014 incident. (*Id.* at 835). On cross-examination, he was impeached with the transcript of his plea colloquy. (*Id.* at 821). Mr. Cappellino acknowledged that, during the colloquy, he answered "Yes" to the following questions: "The home invasion robbery was what, [Mr.] Tirado's idea? Is that the scenario?" (*Id.* at 821-22). Mr. Cappellino also said "Yes" when asked during the colloquy whether "they got money or dope or both at the house." (*Id.* at 824). And he answered in the affirmative when the judge asked, "[Y]ou guys went there to get that? Is that what the plan was?" (*Id.* at 824-25).

4

The jury received the standard instruction on the principal theory of liability. (*Id.*, Ex. 15, at 1085-86). Under the law of principals, a defendant is "liable for acts performed by another if the proof sustains the jury's view that the defendant intended the criminal act be done, coupled with some act or word to incite, cause, encourage, assist, or advise the other to commit the crime." *Barfield v. State*, 762 So. 2d 564, 566-67 (Fla. 2d DCA 2000). In closing, the prosecution urged the jury to "take into account [the] principal instruction" when "thinking about this home invasion robbery." (Doc. 7-2, Ex. 15, at 994). It explained that Mr. Debella "must be treated as if he had done all the things that [his co-defendants] did" if he "intended to commit the home invasion" and "incite[d], cause[d], encourage[d], or advise[d] the other persons to commit or attempt to commit the crime." (*Id.* at 994-95).

The jury found Mr. Debella guilty of the lesser-included offense of robbery with a firearm. (*Id.*, Ex. 16, at 1). It made a special finding, however, that Mr. Debella did not "actually possess a firearm during the commission of the offense." (*Id.*) Because he qualified as a prison releasee reoffender, Mr. Debella received a mandatory sentence of life imprisonment. (*Id.*, Ex. 15, at 1128). Following an unsuccessful direct appeal, *Debella v. State*, 240 So. 3d 648 (Fla. 2d DCA 2017), Mr. Debella moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 7-2, Ex. 22). The postconviction court rejected Mr. Debella's claims, and the appellate court affirmed without opinion. (Doc. 7-2, Ex. 26; *Debella v. State*, 290 So. 3d 467 (Fla. 2d DCA 2020)). This federal habeas petition followed. (Doc. 1).

## II.     Standards of Review

### A.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application

of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

In Mr. Debella's case, the appellate court affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

### B.    Ineffective Assistance of Counsel

Mr. Debella alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed

to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Debella must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Debella must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

### III.    Discussion[1]

#### A.    Ground One—Failure to Request Independent Act Instruction

Mr. Debella contends that trial counsel was ineffective for failing to request an "independent act" jury instruction. (Doc. 1 at 28). The independent act doctrine applies "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, which fall outside of, and are foreign to, the common design of the original collaboration." *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000). "Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act." *Id.* "The independent act theory allows, under narrow circumstances, a limit to [the] broad scope of culpability" created by the law of principals. *Roberts v. State*, 4 So. 3d 1261, 1265 (Fla. 5th DCA). As explained above, "[t]o be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime." *Watkins v. State*, 826 So. 2d 471, 474 (Fla. 1st DCA 2002).

Mr. Debella contends that an independent act instruction "would have provided a viable defense." (Doc. 1 at 28). He points to the testimony of Mr. Cappellino, his co-defendant, who claimed that Mr. Debella "was merely present at the apartment to purchase drugs and did not foresee or participate in the escalation that took place between [Mr.]

---

[1] Respondent contends that Grounds One and Four are unexhausted. (Doc. 7 at 7). The Court disagrees. Mr. Debella raised both claims in his Rule 3.850 motion, and he challenged their denial on appeal. (Doc. 7-2, Ex. 22, at 11-16, 22-24; Doc. 7-2, Ex. 28, at 12-15, 22-23).

Cappellino and [Mr. Topping]." (*Id.* at 37). Based on this testimony, counsel allegedly could have argued that Mr. Cappellino's actions—punching Mr. Topping and grabbing his gun—were "outside of and foreign to . . . the original [plan] of a drug deal." (*Id.* at 31). That, in turn, would have allowed the jury to find that Mr. Debella was not responsible as a principal for Mr. Cappellino's criminal acts. (*Id.* at 29).

The postconviction court rejected this claim. (Doc. 7-2, Ex. 26, at 2-4). Applying Florida law, it held that the "evidence introduced at trial" did not "support the independent act instruction." (*Id.* at 3). The court acknowledged Mr. Cappellino's trial testimony that he merely "secured the victim's gun for safekeeping during a conversation with the victims about a drug transaction, and that [Mr. Debella] did not participate in any way other than being there." (*Id.*) It noted, however, that Mr. Cappellino "admitted during his own plea colloquy that the home invasion robbery was codefendant [Mr.] Tirado's idea to get money and drugs from the house."[2] (*Id.*) Based on these "unique facts and circumstances," the court found "no reasonable probability that [the trial judge] would have given the independent act instruction if requested." (*Id.* at 4). Thus, Mr. Debella failed to establish either deficient performance or prejudice from the failure to request the instruction. (*Id.*)

---

[2] The postconviction court referred to Mr. Cappellino as "the [d]efendant" in this part of the order, citing the portion of the trial transcript where Mr. Cappellino was impeached with his plea colloquy. (Doc. 7-2, Ex. 26, at 3). It appears that the reference to Mr. Cappellino as "the [d]efendant"—rather than Mr. Debella's "co-defendant"—was a scrivener's error. Indeed, the postconviction court was presided over by the same judge who conducted Mr. Debella's trial, and it is unlikely that he confused Mr. Cappellino with Mr. Debella—or believed that Mr. Debella pled guilty to the very offense for which he stood trial. This reading of the postconviction court's order comports with AEDPA's "demand[] that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, the "evidence introduced at trial" did not "support the independent act instruction." (Doc. 7-2, Ex. 26, at 3). Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Mr. Debella] argues [she] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Sabillo v. Sec'y, Dep't of Corr.*, 355 F. App'x 346, 349 (11th Cir. 2009) ("The state courts concluded that [petitioner] was not entitled to an instruction about third degree murder based on the evidence at trial, and we defer to that conclusion."); *Coldiron v. Jones*, No. 3:14-cv-181-LC-CJK, 2016 WL 7031973, at *22 (N.D. Fla. Aug. 30, 2016) ("The state courts concluded, as a matter of state law, that petitioner was not entitled to an instruction about independent act based on Florida precedent, and this court defers to that conclusion."), *adopted by* 2016 WL 7031292 (N.D. Fla. Nov. 30, 2016).[3]

---

[3] *See also Young v. Florida*, No. 20-cv-61074-RAR, 2022 WL 2834668, at *9 (S.D. Fla. July 20, 2022) (rejecting ineffective assistance claim because "[t]he state court concluded that the independent act doctrine did not apply under state law, and this Court cannot second-guess that dispositive legal conclusion"), *aff'd*, No. 22-13319, 2024 WL 3964936 (11th Cir. Aug. 28, 2024); *Milton v. Inch*, No. 4:18-cv-581-RH-MJF, 2020 WL 3230278, at *12 (N.D. Fla. May 20, 2020) ("This court . . . defers to the state court's state-law conclusion that [petitioner] did not qualify for an instruction on Florida's independent act defense."), *adopted by* 2020 WL 3213377 (N.D. Fla. June 12, 2020); *Melton v. McDonough*, No. 3:06-cv-545-MCR-EMT, 2007 WL 2904133, at *15 (N.D. Fla. Oct. 4, 2007) ("This court must accord deference to the state court's decision to the extent it decides the validity of Petitioner's underlying state law claim, that is,

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that Mr. Debella was not entitled to an independent act instruction, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Therefore, the postconviction court reasonably concluded that counsel was not ineffective for failing to request an independent act instruction.

Mr. Debella argues that the postconviction court's "finding that the independent act instruction was not supported by the evidence . . . amounts to an unreasonable determination of the facts." (Doc. 1 at 32). In support, he invokes § 2254(d)(2), which requires deference "to a state court's determination of the facts unless the state-court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Sears v. Warden GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting 28 U.S.C. § 2254(d)(2)). This argument lacks merit. As the Eleventh Circuit explained, "the source of absolute deference to state . . . courts on state law issues does not come from § 2254(d) or any other AEDPA provision." *Calhoun*, 92 F.4th at 1352. "It is grounded instead in fundamental tenets of federalism and the dichotomy of state and federal law that shapes our federal-state system." *Id.* These principles require "*unconditional* deference to a state . . . court's decision of a state law

---

whether he was entitled to an 'independent act' instruction, while reserving for federal habeas review the ultimate issue of whether the state court's decision on the ineffective assistance of counsel claim was unreasonable.").

issue in a federal habeas case." *Id.* (emphasis added). Thus, this Court has "no authority to question" the postconviction court's finding that Mr. Debella was not entitled to the independent act instruction.[4] *Id.* at 1351.

Deference aside, Mr. Debella cannot show prejudice because even if the instruction had been given, there is no "reasonable probability that . . . the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). Mr. Debella's independent act defense rests on the testimony of Mr. Cappellino, who claimed at trial that "there was no home invasion robbery. We went to get some pills and that's it." (Doc. 7-2, Ex. 14, at 821). As explained above, however, the jury learned that Mr. Cappellino admitted to the robbery during his plea colloquy. Specifically, Mr. Cappellino answered "Yes" to the following questions: "The home invasion robbery was what, [Mr.] Tirado's idea? Is that the scenario?" (*Id.* at 821-22). Because Mr. Cappellino— a fifteen-time convicted felon—was thoroughly impeached with his contrary statements, no reasonable probability exists that the outcome at trial would have been different had the jury received the independent act instruction. *Cf. Moss v. Hofbauer*, 286 F.3d 851, 867 (6th Cir. 2002) (no prejudice from failure to call witness because, among other things, "the prosecutor could have thoroughly impeached [him] with his contrary statements given first to the police and later at his guilty plea proceeding").

---

[4] The Eleventh Circuit in *Calhoun* recognized that "absolute deference to holdings on state law issues that are intertwined in a federal claim can determine the outcome of a federal habeas case." *Calhoun*, 92 F.4th at 1352. It nonetheless found that this "absolute deference" was "compelled by [a] dozen or so decisions of the Supreme Court and [the Eleventh Circuit]." *Id.*

**B.      Ground Two—Allowing Trial Court to "Invade the Province of the Jury and Comment on the Evidence"**

Mr. Debella faults trial counsel for allowing the trial court to "inject [itself] into deliberations and comment on a crucial piece of evidence in response to a jury question." (Doc. 1 at 38). During deliberations, the jury asked for "a copy of [Mr. Cappellino's] testimony." (Doc. 7-2, Ex. 15, at 1104). With the parties' consent, the court explained to the jury that the court reporter did not use "real time reporting," and that therefore the court did not "automatically [have] transcripts of everything that's said." (*Id.* at 1107). The court noted, however, that it could ask the court reporter to "read back" "certain testimony." (*Id.*) It instructed the jury to "go back to the jury room" and "write down, as specific as possible, those areas that you feel that you need to have read back to you." (*Id.* at 1108).

The jury returned with the following question: "Does [Mr. Cappellino] ever confirm in his testimony that three guns were definitely involved?" (*Id.* at 1109). The court and the parties discussed how to proceed. As the court correctly observed, Mr. Cappellino testified that "[t]his wasn't a home invasion robbery because there were no guns involved other than the one that [he] took off of" Ms. Hudson. (*Id.*; *see also id.*, Ex. 14, at 810-11). Thus, the court explained that "the answer to [the] question is[,] [Mr. Cappellino] never confirmed that three guns were involved." (*Id.*, Ex. 15, at 1110). Defense counsel proposed that "[w]e can just answer no." (*Id.* at 1111). The prosecution said, "I'm fine with that." (*Id.* at 1112). When the jury returned, the court gave the following answer: "[T]he State and the Defense in this case have stipulated that the answer to, Does [Mr. Cappellino] ever confirm in his

testimony that three guns were definitely involved, they stipulate that the answer to that question is no." (*Id.* at 1113-14).

Mr. Debella does not contend that this response was factually incorrect. To the contrary, the court accurately noted that the answer to the jury's question was "no." Mr. Debella nonetheless argues that counsel should have "demanded a read-back of [Mr.] Cappellino's testimony so that the jury could reach [its] own determination." (Doc. 1 at 42). According to Mr. Debella, the trial court "invaded the fact-finding province of the jury" by directly answering its question. (*Id.* at 41). Moreover, the answer allegedly "left too much open for speculation" because the jury could have mistakenly believed that Mr. Cappellino described "two firearms" rather than "only one." (*Id.*)

The postconviction court rejected this claim. It found that Mr. Debella could not prove "prejudice[] [from] counsel's failure to object and request that [Mr.] Cappellino's testimony be read back to the jury in its entirety." (Doc. 7-2, Ex. 26, at 5). The court explained that the jury asked a "'yes or no' question"—whether Mr. Cappellino "ever confirmed that there were three guns involved." (*Id.*) Had Mr. Cappellino's testimony been "played back for the jury, [it] would have either arrived at the same answer as the [c]ourt provided, which is that [Mr.] Cappellino did not confirm that there were three guns involved, or [it] could have arrived at an incorrect conclusion that he did testify that there were three guns involved." (*Id.*) Thus, Mr. Debella could not show that "he was prejudiced by the [c]ourt providing the jury with an accurate answer to [its] question, especially considering that the jury found that [Mr. Debella] did not possess a firearm during the home invasion robbery." (*Id.*) Finally, the court rejected as "entirely speculative" Mr. Debella's

assertion that the "jury would have found him not guilty or guilty of some lesser-included offense if counsel had persuaded the [c]ourt to read back the entirety of [Mr.] Cappellino's testimony instead of answering the jury's specific question." (*Id.* at 5-6).

This ruling was reasonable. A fairminded jurist could find no prejudice from counsel's failure to request a read-back of Mr. Cappellino's testimony. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Debella]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Debella cannot meet this demanding standard. The trial court correctly answered the jury's question by clarifying that Mr. Cappellino never "confirm[ed] in his testimony that three guns were definitely involved." (Doc. 7-2, Ex. 15, at 1113-14). Mr. Debella says this answer was insufficient because the jury could have mistakenly believed that Mr. Cappellino described "two firearms" rather than "only one." (Doc. 1 at 41). But there is no evidence to support this assertion. And the speculative possibility that the jury could have made this mistake is not enough to establish prejudice. Under *Strickland*, "[t]he

likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Thus, Mr. Debella's "claim of prejudice" cannot rest on "mere speculation" about the jury's understanding of Mr. Cappellino's testimony. *Fuqua v. Sec'y, Dep't of Corr.*, 409 F. App'x 243, 246 (11th Cir. 2010).

Moreover, had the court read back Mr. Cappellino's testimony in its entirety, the jury would have heard for a second time the highly damaging admissions he made during his plea colloquy. As noted above, Mr. Cappellino admitted during his guilty plea proceedings that the plan was to rob the victims of drugs and money. (Doc. 7-2, Ex. 14, at 821-25). Any benefit Mr. Debella might have gained from a read-back would have to be balanced against the harm to his defense from reminding the jury of Mr. Cappellino's admissions. *Cf. United States v. Van Dyke*, 605 F.2d 220, 227 (6th Cir. 1979) ("If the jury did forget testimony, and we do not so conclude from the record, it is equally probable that the jury forgot evidence favorable to the prosecution . . . as it is probable that the jury forgot evidence favorable to [the defendant]."). In these circumstances, the Court cannot say that the finding of no prejudice "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### C.    Ground Three—Failure to Give Jury Option to Convict Mr. Debella of Both Theft and Assault

Mr. Debella contends that trial counsel provided ineffective assistance by failing to ensure that the jury had "the option to convict [him] of both" theft and assault as lesser-included offenses. (Doc. 1 at 43-44). The verdict form listed these two crimes as lesser-

included offenses. (Doc. 7-2, Ex. 16, at 2-3). But it instructed the jury to "check only one" of the offenses on the form. (*Id.* at 1). Mr. Debella argues that, under Florida law, the jury should have had the option to convict him of "*both* lesser-included offenses of assault and theft." (Doc. 1 at 46). According to him, "a reasonable probability exists that the jury would have exercised that option." (*Id.*)

The postconviction court rejected this claim because it "fail[ed] both prongs of *Strickland*." (Doc. 7-2, Ex. 26, at 7). The court explained that, "even if counsel had requested [the relevant] instruction, there [was] no reasonable probability that the jury would have convicted him of theft and assault when they were charged with finding him guilty of the highest offense supported by the evidence, the evidence supported a conviction of robbery with a firearm, and the jury did find [Mr. Debella] guilty of robbery with a firearm." (*Id.*)

The postconviction court acted reasonably in rejecting this claim. Florida law requires a jury to "render a true verdict according to the law and the evidence." *Sanders v. State*, 946 So. 2d 953, 958 (Fla. 2006). Thus, a jury may convict of a lesser-included offense "only if it decide[s] that the main accusation has not been proved beyond a reasonable doubt." *Id.* In accord with this principle, the jury in Mr. Debella's case was instructed that if it "return[ed] a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt." (Doc. 7-2, Ex. 15, at 1094). The Court must assume that the jury followed this instruction. *See Strickland*, 466 U.S. at 694 ("[A] court should presume . . . that the judge or jury acted according to law."). As noted above, the jury found Mr. Debella guilty of armed robbery—a higher offense than theft or assault. (Doc. 7-2, Ex.

18

16). Thus, "even if the lesser-offense instructions had been given, the jury would not have been permitted to convict [Mr. Debella] of the lesser-included offenses because it had concluded that the evidence established that he was guilty of the greater offense[]." *Crapser v. Sec'y, Dep't of Corr.*, 855 F. App'x 626, 628 (11th Cir. 2021).

Mr. Debella's claim "depends . . . on the possibility of a jury pardon—that is, that the jury would have disregarded its oath and violated its instructions by acquitting him of the greater offense and convicting him of [] lesser one[s] even though the evidence supported [the greater offense]." *Id.* "The possibility of a jury pardon, however, cannot establish prejudice under *Strickland*." *Thornton v. Sec'y, Fla. Dep't of Corr.*, No. 3:18-cv-762-MMH-PDB, 2021 WL 2073685, at *9 (M.D. Fla. May 24, 2021); *see also Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x 888, 889 (11th Cir. 2012) ("The jury in [petitioner's] trial concluded that the evidence against him supported his conviction for the greater offenses on which it was instructed; therefore, even if the lesser-offense instructions had been given, the jury would not have been permitted to convict [petitioner] of the lesser included offenses because it had concluded that the evidence established that he was guilty of the greater offenses."). Accordingly, the postconviction court reasonably rejected this claim.

### D.    Ground Four—Failure to Object to Standard Instruction on Principal Liability

Lastly, Mr. Debella faults trial counsel for "failing to object to the standard jury instruction on principal[] [liability]." (Doc. 1 at 47). As noted above, the jury received Florida's standard instruction on the law of principals:

> If the Defendant helped another person or persons commit or attempt to commit a crime, the Defendant is a principal and must be treated as if he had done all the things the other person or persons did if:
>
> One, the Defendant had a conscious intent the criminal act be done;
>
> And, two, the Defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

(Doc. 7-2, Ex. 15, at 1085-86).

Mr. Debella contends that this standard instruction is "flawed because it does not account for those situations . . . where the jury hears evidence of a defendant's participation in additional crimes that were not charged in the information." (Doc. 1 at 47). According to Mr. Debella, the jury in his case "heard evidence of two crimes, a drug deal and an alleged robbery." (*Id.* at 48). But "only the robbery offense was charged in the information." (*Id.*) Thus, in Mr. Debella's view, "[b]y instructing the jury that [he] was a principal based upon him helping to commit 'a crime,' without specifying which crime, [the standard instruction] opened the door for the jury to convict [him] as a principal to robbery upon a finding that he was a willing participant to the initial drug transaction." (*Id.*) Mr. Debella says that counsel should have asked for a special instruction clarifying that he could be held responsible as a principal only if he helped commit "the specific crime charged in the information"—that is, robbery. (*Id.* at 47).

The postconviction court rejected this claim for lack of prejudice. (Doc. 7-2, Ex. 26, at 7). It explained that Mr. Debella could not show that "he was prejudiced by the principal instruction that was read to the jury because the instruction was clear the crime related back to the crime of home invasion robbery, not any other crime that could have possibly been

committed, such as a drug offense." (*Id.* at 7-8). Moreover, "[t]he entire focus of the trial was the alleged home invasion robbery, not whether [Mr. Debella] was guilty of a petit drug offense." (*Id.* at 8). Thus, the court found "no reasonable probability that the outcome of the trial would have been different if counsel had requested the jury instructions alleged in the [Rule 3.850] motion because the focus of the entire trial was whether [Mr. Debella] was guilty of home invasion robbery." (*Id.*)

This ruling was reasonable. Mr. Debella cannot show that the postconviction court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317. Neither side argued that Mr. Debella could be convicted of robbery as a principal simply because he participated in a drug deal. When discussing the principal instruction in closing argument, the prosecution explained that Mr. Debella "must be treated as if he had done all the things that [his co-defendants] did" if he "intended to commit the home invasion" and "incite[d], cause[d], encourage[d], or advise[d] the other persons to commit or attempt to commit the crime." (Doc. 7-2, Ex. 15, at 994-95). Later, the prosecution again discussed the principal instruction in the context of robbery:

> [R]emember, you're still applying that principal theory to all of this. Even if . . . you come to the conclusion that Nicholas Debella didn't actually put stuff or *take stuff*, it was Matthew Cappellino. It was Gedeon Tirado. . . .
>
> And the fact that you find that he didn't actually *pick something up* himself, under the principal theory, it really makes no difference because they're all working together as a team.

(*Id.* at 1001-02 (emphasis added)). The prosecution repeated this point during its rebuttal argument:

> Now, one of the elements, as [defense counsel] pointed out, that the State has the burden to prove beyond a reasonable doubt is at the time Nicholas Debella entered the dwelling, he intended to *commit a robbery*.
>
> But it's not just him. Because as [the other prosecutor] explained with the law of principals, it's everybody. That when they entered, they intended to do this.

(*Id.* at 1050 (emphasis added)).

In context, therefore, the question before the jury was whether Mr. Debella knew about the robbery and assisted in it—not whether he was aware of a drug deal. Against this, Mr. Debella conjectures that the jury might have convicted him "as a principal to robbery upon a finding that he was a willing participant to the initial drug transaction." (Doc. 1 at 48). But, as the postconviction court explained, "[t]he entire focus of the trial was the alleged home invasion robbery, not whether [Mr. Debella] was guilty of a petit drug offense." (Doc. 7-2, Ex. 26, at 8). Thus, Mr. Debella's unsupported speculation is insufficient to satisfy his burden to "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. In these circumstances, a fairminded jurist could find "no reasonable probability that the outcome of the trial would have been different if counsel had requested [a modified instruction] because the focus of the entire trial was whether [Mr. Debella] was guilty of home invasion robbery." (Doc. 7-2, Ex. 26, at 8).

Even under *de novo* review, Mr. Debella's claim fails for the additional reason that he cannot show deficient performance.[5] As noted above, the jury received Florida's standard instruction on principal liability. Counsel is not deficient for declining to object

---

[5] "Because the state court did not decide whether [Mr. Debella's] counsel was deficient, [the Court] review[s] this element of [his] *Strickland* claim *de novo*." *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

to jury instructions that are consistent with the standard instructions approved by the Florida Supreme Court. *See Conrad v. Sec'y, Fla. Dep't of Corr.*, 663 F. App'x 746, 753 (11th Cir. 2016) (petitioner failed to satisfy *Strickland*'s performance prong because "Florida precedent indicates that trial counsel's failure to object to standard jury instructions that had not been invalidated by the Florida Supreme Court do[es] not render counsel's performance deficient"); *Forbes v. Sec'y, Dep't of Corr.*, No. 20-60009-CIV, 2022 WL 17082912, at *14 (S.D. Fla. Nov. 18, 2022) ("[C]ounsel cannot be ineffective for failing to object to a standard instruction unless the Florida Supreme Court had invalidated that instruction before trial."); *see also Griffin v. State*, 866 So. 2d 1, 15 (Fla. 2003) ("[I]t is not deficient performance when counsel fails to object to a standard instruction which has not been invalidated by [the Florida Supreme] Court.").

## IV.   Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Debella's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Debella and to **CLOSE** this case.

3. Mr. Debella is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Debella must show that reasonable jurists would find debatable both the merits of the

underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Debella has not made the requisite showing. Because Mr. Debella is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on March 21, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE